IN THE SUPREME COURT OF NORTH CAROLINA

No. 21A20

Filed 25 September 2020

IN THE MATTER OF: L.M.M.


Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from order entered on 27 September 2019 by Judge David V. Byrd in District Court, Wilkes County. This matter was calendared in the Supreme Court on 27 August 2020 but was determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Vannoy, Colvard, Triplett & Vannoy, P.L.L.C., by Daniel S. Johnson, for petitioner-appellee.*

*Robert W. Ewing for respondent-appellant.*

DAVIS, Justice.

In this case, we consider whether the trial court erred by terminating the parental rights of respondent-mother to her son "Larry."[1] Because we conclude that the evidence and the trial court's findings of fact support the conclusion that respondent willfully abandoned Larry within the meaning of N.C.G.S. § 7B-1111(a)(7), we affirm.

**Factual and Procedural Background**

---

[1] A pseudonym is used throughout this opinion to protect the identity of the juvenile.

Larry was born in November 2016 and spent the first year of his life in respondent's care and custody. Petitioner is respondent's second cousin and a lifelong resident of Wilkes County, North Carolina. Petitioner attended the same church as respondent and saw respondent with Larry each week during services. Petitioner also spent time with Larry at her grandmother's house in Hays, North Carolina, when respondent was living nearby.

Petitioner lost touch with respondent at some point in 2017. In November 2017, petitioner contacted respondent on Facebook and learned that she had moved to Asheville with Larry. Respondent told petitioner that she was unemployed, out of money, and alternating between staying at a friend's house and sleeping in her car. Respondent confessed that she was unable to take care of Larry and asked petitioner to keep him for "a few months" until respondent "got back on her feet."

After conferring with her then-husband,[2] petitioner agreed to take Larry on the condition that respondent permanently sign over her parental rights regarding him to petitioner. Respondent initially reiterated her desire for a temporary arrangement but ultimately agreed to surrender Larry to petitioner on a permanent basis.

---

[2] Petitioner testified that she and her husband separated on 24 November 2017 and later divorced on 13 August 2019.

On 8 November 2017,[3] petitioner drove to the Greyhound bus station in Asheville to take Larry from respondent. At petitioner's request, respondent signed a document that purported to give petitioner permanent parental rights to Larry. A family friend notarized the document in the parties' presence. Petitioner then brought Larry back to live with her. A few weeks later, respondent contacted petitioner on Facebook to check on Larry and asked for a picture of him. Respondent also asked for money. Petitioner sent respondent a photograph of Larry but refused to wire her any money.

Respondent also phoned petitioner to ask if she would pay respondent's cell phone bill. Petitioner's mother paid respondent's phone bill for a brief period of time so that petitioner and respondent would be able to contact each other.

After respondent sent her a second request for money on 21 November 2017, petitioner blocked respondent on Facebook. Petitioner maintained the same phone number thereafter but did not hear from respondent or make any attempt to contact her after 21 November 2017. Respondent was incarcerated during 2018 and remained in custody at the time of the termination hearing.

On 18 January 2019, after initiating adoption proceedings, petitioner filed a petition to terminate respondent's parental rights to Larry. Respondent filed a response in opposition to the petition. The trial court held a hearing on 14 August

---

[3] Although the trial court's order lists the date as 17 November 2017, the hearing testimony reflects a date of 8 November 2017.

2019 and entered an order terminating respondent's parental rights to Larry on 27 September 2019. Respondent gave timely notice of appeal from the order.[4]

**Analysis**

Our Juvenile Code provides for a two-step process for the termination of parental rights—an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2019). At the adjudicatory stage, the petitioner bears the burden of proving by clear, cogent, and convincing evidence the existence of one or more grounds for termination under subsection 7B-1111(a). N.C.G.S. § 7B-1109(e), (f). If the trial court finds the existence of one or more grounds to terminate the respondent's parental rights, the matter proceeds to the dispositional stage where the court must determine whether terminating the parent's rights is in the juvenile's best interests. N.C.G.S. § 7B-1110(a).

Respondent does not contest the trial court's dispositional determination that it was in Larry's best interests to terminate her parental rights. Accordingly, the sole issue before us is whether the trial court correctly determined that one or more grounds existed to terminate her parental rights under N.C.G.S. § 7B-1111.

We review a trial court's adjudication under N.C.G.S. § 7B-1111 "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re Montgomery*, 311 N.C. 101, 111, 316

---

[4] Although the trial court's order also terminated the parental rights of Larry's father, he is not a party to this appeal.

S.E.2d 246, 253 (1984). "Where no exception is taken to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal." *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991). We review the trial court's conclusions of law de novo. *In re C.B.C.*, 373 N.C. 16, 19, 832 S.E.2d 692, 695 (2019).

The trial court concluded that petitioner had established three statutory grounds for terminating respondent's parental rights, including that respondent had "willfully abandoned" Larry pursuant to N.C.G.S. § 7B-1111(a)(7). It is well established that an adjudication of any single ground for termination under N.C.G.S. § 7B-1111(a) will suffice to support a trial court's order terminating parental rights. *See, e.g., In re C.B.C.*, 373 N.C. at 23, 832 S.E.2d at 697. Therefore, if we uphold any one of the three statutory grounds adjudicated by the trial court, we need not review the remaining grounds. *Id.*; *In re E.H.P.*, 372 N.C. 388, 395, 831 S.E.2d 49, 53 (2019).

Subsection 7B-1111(a)(7) allows for the termination of parental rights where the parent has "willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of the petition." N.C.G.S. § 7B-1111(a)(7). The determinative time period in this case is the six-month period between 18 July 2018 and 18 January 2019, the date petitioner filed her petition. We have held that "the trial court may consider a parent's conduct outside the six-month window in evaluating a parent's credibility and intentions" during the six months at issue. *In re C.B.C.*, 373 N.C. at 22, 832 S.E.2d at 697 (emphasis removed) (citation omitted).

As used in N.C.G.S. § 7B-1111(a)(7), abandonment requires a "purposeful, deliberative and manifest willful determination to forego all parental duties and relinquish all parental claims to the child." *In re A.G.D.*, 374 N.C. 317, 319, 841 S.E.2d 238, 240 (2020) (cleaned up). The willful intent element "is an integral part of abandonment" and is determined according to the evidence before the trial court. *Pratt v. Bishop*, 257 N.C. 486, 501, 126 S.E.2d 597, 608 (1962). This Court has repeatedly held that "if a parent withholds that parent's presence, love, care, the opportunity to display filial affection, and willfully neglects to lend support and maintenance, such parent relinquishes all parental claims and abandons the child." *In re A.L.S.*, 374 N.C. 515, 519, 843 S.E.2d 89, 92 (2020) (cleaned up).

In her brief, respondent challenges several of the trial court's findings of fact as unsupported by clear, cogent, and convincing evidence and disputes the trial court's conclusion of law that respondent willfully abandoned Larry. We address her contentions in turn.

## I. Findings of Fact

In addition to recounting the circumstances of how Larry came into petitioner's care in November 2017, the trial court made the following pertinent findings of fact regarding its adjudication of willful abandonment under N.C.G.S. § 7B-1111(a)(7):

> 13. Apart from the Facebook messenger text [in November 2017], the Respondent-Mother has had no other contact with the Petitioner regarding the minor child. She has sent some requests for money to the Petitioner. The Petitioner's mother paid a cell phone bill for the

Respondent-Mother so the Respondent-Mother could be contacted if needed.

. . . .

15. Neither parent has provided any financial support for the minor child.

. . . .

17. Each of the Respondents are currently incarcerated . . . . The Respondent-Mother has a projected release date in December 2019.

18. Neither parent has provided any type of gifts, cards, or other customary tokens of affection for the minor child since he has been in the custody of the Petitioner. Neither parent has ever taken any action as would have been available to them while in custody.

19. During the six months immediately preceding the filing of the petition to terminate their parental rights, neither Respondent had any contact with the minor child. During the six months immediately preceding the filing of the petition, neither respondent provided any financial support for the minor child.

20. Neither Respondent has performed any of the natural and legal obligations of support and maintenance for the minor child since he has been in the custody of the Petitioner. . . .

. . . .

22. Although the Petitioner blocked the Respondent-Mother on Facebook, she did not block her access by phone and Respondent-Mother also could communicate with her family members.

Respondent initially contests the portion of Finding of Fact 13 providing that

she contacted petitioner about Larry on Facebook on just one occasion in November 2017, contending that she in fact contacted petitioner several times that month. In her testimony, petitioner described two instances in November 2017 when respondent sent her Facebook messages about Larry. In the first message, respondent asked how Larry was doing and—after petitioner declined her request for money—requested a picture of him. Upon receiving the picture, respondent sent petitioner a message saying, "Sweet, little baby," and "Love y'all." On 21 November 2017, the day after her second request for money, respondent sent petitioner a message asking whether Larry "had a good birthday[.]" When petitioner replied in the affirmative, respondent sent a message saying "good." Although petitioner also received "a couple [of phone] calls" from respondent during this period, she testified that one of the calls concerned "a cell phone bill [respondent] wanted paid," and that she could not recall the subject of the second call. To the extent that Finding of Fact 13 undercounts the number of messages respondent sent to petitioner about Larry in November 2017, we conclude the discrepancy is harmless because the messages were exchanged "well outside the determinative [six-month] time period." *In re K.N.K.*, 374 N.C. 50, 56, 839 S.E.2d 735, 740 (2020).

Respondent next challenges the portions of Finding of Fact 18 stating that she failed to provide "tokens of affection" or take other "available" actions to show Larry affection while she was incarcerated. She contends that petitioner offered no evidence "on the issue of whether [respondent] could obtain gifts or other customary tokens of

affection [for Larry] while she was in prison."

The trial court's finding is supported by testimony detailing the communications between respondent and petitioner. Petitioner's testimony supports the finding that respondent did not contact petitioner about Larry after 21 November 2017 and never provided Larry with any sign of her affection after placing him in petitioner's care. The evidence presented at the adjudicatory stage of the hearing does not reveal precisely when in 2018 respondent became incarcerated. However, the fact that respondent never exhibited affection to Larry after November 2017 necessarily supports a finding that she did not do so during her incarceration.

We have made clear that "[a]lthough a parent's options for showing affection while incarcerated are greatly limited, a parent *will not be excused from showing interest in [the] child's welfare by whatever means available." In re C.B.C.*, 373 N.C. at 19–20, 832 S.E.2d at 695; *see also In re E.H.P.*, 372 N.C. at 394, 831 S.E.2d at 53 ("[T]he fact that respondent was incarcerated for almost the entirety of the six-month period preceding the filing of the termination petition does not preclude a finding of willful abandonment under N.C.G.S. § 7B-1111(a)(7).”). Contrary to respondent's characterization of Finding of Fact 18, the trial court did not find that she had the ability to send Larry "gifts, cards, or other customary tokens of affection" while incarcerated. Rather, the court found that respondent had not taken "*any action* [emphasis added] as would have been available to [her]" while incarcerated so as to demonstrate interest in or affection toward Larry.

The evidence before the trial court showed that respondent was in possession of petitioner's phone number and had other shared relatives in Wilkes County through whom respondent could have attempted to communicate with Larry, including respondent's own mother as well as petitioner's mother and grandmother. Petitioner testified that she spoke to respondent's mother "regularly" and had "never been advised" of any attempt by respondent to contact her about Larry. Based on this evidence, the trial court reasonably inferred that respondent had some means available to display familial affection for Larry despite the circumstance of her incarceration. *See In re A.G.D.*, 374 N.C. 317, 327, 841 S.E.2d 238, 244 (2020) ("Although the fact that he was incarcerated and subject to an order prohibiting him from directly contacting the children created obvious obstacles to respondent-father's ability to show love, affection, and parental concern for the children, it did not render such a showing completely impossible.").

## II.  Conclusions of Law

Respondent also argues that the trial court's findings that she did not contact Larry or provide financial support for the child during the determinative six-month period—even if accurate—do not support the court's conclusion that she *willfully* abandoned the child. Respondent contends that the trial court's findings fail to account for petitioner's unwillingness to allow her to have contact with Larry after November 2017. She further asserts that the court heard no evidence that she had the ability to provide financial support for Larry while she was incarcerated.

Respondent argues that the evidence showed "[her] lack of contact and financial support was **not** a willful act on her part."

This Court previously addressed a similar willful abandonment issue involving an incarcerated parent in *In re A.G.D.* In that case, we reviewed an adjudication of willful abandonment that was made where the evidence showed that the respondent-father was incarcerated, divorced from the children's mother, and subject to a court order "granting the mother sole legal and physical custody of the children, with respondent-father being ordered to have no contact with them in the absence of a further order of the court." 374 N.C. at 318, 841 S.E.2d at 239. Despite the obvious impediments faced by the respondent-father, we held that the trial court's findings nevertheless demonstrated his willful abandonment of the children:

> A careful review of the termination orders reveals that the trial court did not conclude that respondent-father's parental rights in the children were subject to termination on the grounds of abandonment solely because he had failed to make direct contact with them in violation of the custody and visitation order. On the contrary, the trial court specifically noted that respondent-father was "not excused from showing an interest in his children's welfare" because of his incarceration and found as a fact that, among other things, the only attempt that respondent-father had made to contact the children had occurred when he communicated with petitioner-mother about eighteen months after his last "meaningful" contact with them. In other words, the trial court found that respondent-father had, with one exception, done nothing to maintain contact with the mother, with whom the children lived and who would know how they were doing[.]

*Id.* at 324, 841 S.E.2d at 242–43. Based on our determination that "the trial court's findings of fact reflect that respondent-father failed to do anything whatsoever to express love, affection, and parental concern for the children during the relevant six-month period," we affirmed the order terminating his parental rights pursuant to N.C.G.S. § 7B-1111(a)(7). *Id.* at 327, 841 S.E.2d at 244.

Here, as in *In re A.G.D.*, respondent's complete failure to show any interest in Larry after November 2017—particularly during the six months between 18 July 2018 and 18 January 2019—supports the trial court's conclusion that she acted willfully in abandoning the child. Unlike the respondent-father in *In re A.G.D.*, respondent was not subject to a court order that overrode her custodial rights as Larry's mother or otherwise barred her from contacting her child. Although petitioner blocked respondent on Facebook, respondent was not precluded from contacting petitioner by phone or contacting other relatives, including her own mother, in order to convey her concern and affection for Larry. *See In re A.L.S.*, 374 N.C. at 522, 843 S.E.2d at 94 (holding that the "[r]espondent-mother's failure to even attempt any form of contact or communication with [the child] gives rise to an inference that she acted willfully in abdicating her parental role, notwithstanding any personal animus between her and [the child's custodians]"); *In re A.G.D.*, 374 N.C. at 325, 841 S.E.2d at 243 (noting that the "respondent-father had the legal right and practical ability to contact the mother directly or through intermediaries for the purpose of inquiring about the children's welfare and asking that she convey his best wishes to them.").

Respondent also cites the evidence that she initially asked petitioner to accept a temporary caretaking role for Larry in November 2017—thereby resisting petitioner's demand that she "[s]ign him over to [petitioner] permanently"—as proof that she did not willfully abandon the child. The trial court's findings account for the fact that respondent "initially wanted a temporary" arrangement for Larry "but later agreed for the Petitioner to have the child permanently." Although the court was free to consider the circumstances under which respondent placed Larry in petitioner's care, those circumstances represented respondent's intentions in November 2017 rather than during the six-month period relevant to an adjudication under N.C.G.S. § 7B-1111(a)(7). *See In re K.N.K.*, 374 N.C. at 56, 839 S.E.2d at 740. The weight to be assigned to respondent's conduct during this earlier period was a matter left to the trial court's discretion as fact-finder. *See In re C.B.C.*, 373 N.C. at 23, 832 S.E.2d at 697 ("[W]hile the court may consider respondent's prior efforts in seeking a relationship with [the child] . . . , respondent's prior actions will not preclude a finding that he willfully abandoned [the child] pursuant to N.C.G.S. § 7B-1111(a)(7) if he did nothing to maintain or establish a relationship with [her] during the determinative six-month period.").

Finally, while we agree with respondent that the trial court received no evidence of her ability to support Larry financially, there is no indication that the court based its adjudication on this lack of financial support. *See generally Pratt*, 257 N.C. at 501–02, 126 S.E.2d at 608 ("[A] mere failure of the parent of a minor child in

the custody of a third person to contribute to its support does not in and of itself constitute abandonment. Explanations could be made which would be inconsistent with a wil[l]ful intent to abandon."); *see also In re K.N.K.*, 374 N.C. at 54 n.3, 839 S.E.2d at 738 n.3 (concluding the trial court "would have reached the same conclusion about respondent's willful abandonment of" the child even without the finding that he contributed nothing toward her support and maintenance). Although the court found that "[n]either parent has provided any financial support for the minor child[,]" the significance of this finding is to exclude the possibility that respondent demonstrated her concern for Larry financially—rather than through the personal contact and displays of affection contemplated in cases such as *In re A.D.G.*

Because the evidence and the trial court's findings show respondent undertook no action "whatsoever to express love, affection, and parental concern for the child[ ] during the relevant six-month period," we hold that the trial court did not err by determining that grounds existed under N.C.G.S. § 7B-1111(a)(7) to terminate respondent's parental rights. In light of our holding, we need not review the trial court's two additional grounds for termination. *In re C.B.C.*, 373 N.C. at 23, 832 S.E.2d at 697.

## Conclusion

For the reasons stated above, we affirm the trial court's 27 September 2019 order terminating respondent's parental rights.

AFFIRMED.

Justice EARLS, dissenting.

In order to terminate respondent-mother Cathy's parental rights to her son Larry under N.C.G.S. § 7B-1111(a)(7), the trial court needed to find by clear, cogent, and convincing evidence that the parent "willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of the petition or motion." At trial, the burden was not on Cathy to prove that she did not willfully abandon Larry; the burden was on the petitioner, Karen, to prove that Cathy did. *See In re Ballard*, 311 N.C. 708, 716, 319 S.E.2d 227, 232 (1984). The trial court's findings make clear that Karen has failed to meet this burden. The trial court also concluded that Karen proved two other grounds to terminate Cathy's parental rights, neglect and prior termination of the parent's rights as to other children, while rejecting a fourth alleged ground of incapability that will continue for the foreseeable future. Because the evidence was not sufficient to show neglect, and no factual findings were made concerning Cathy's ability or willingness to establish a safe home, I would reverse the trial court's order and remand for further factual findings on the question of whether the evidence in this case was sufficient to conclude that Cathy was unable or unwilling to establish a safe home.

Larry was born on 18 November 2016 and lived with Cathy for almost a year. On 8 November 2017, Cathy asked Karen to temporarily care for Larry. In addition to the pleadings, the only other evidence before the trial court at the adjudicatory stage of the hearing in this private termination proceeding was Karen's testimony.

Karen's testimony regarding Cathy's request highlights that, faced with homelessness and no income, Cathy concluded that Larry needed better care than she was able to provide to her child at that moment in her life. Karen testified to the discussion she had with Cathy, explaining:

> When she asked me if I wanted to do it just until she got back on her feet, I sent back that I could not do that, it would not be fair. She then said, "Well, how about I do this temporarily, and then if I'm not back on my feet in this amount of time, you'll then have full rights." And I then again declined that.

Karen then testified that:

> I printed some online [sic] because I needed to know—I did not want anything to be said that I may have took him while she might have been under the influence or that I may have paid for him or just stole him or anything like that. So yes, I did find some things online. A notary went with me. My mom's friend went with us and notarized everything that was signed. And she was also read— it was dark, so my mom read it out to her, and she signed it.

The paper signed by Cathy that evening was not made a part of the record. The trial court's finding states only that Cathy "later agreed for the Petitioner to have the child permanently." However, Karen's testimony on that point is not at all clear. In addition to the statement above, Karen's only other testimony is that:

> Q.   You asked [Cathy] if she would be willing to relinquish her parental rights?
>
> A.   Sign him over to me permanently is exactly what I said.
>
> Q.   What did [Cathy] tell you?

A.    When I sent that, she was actually away from the phone. One of her friends responded and said that she was not there, but they would let her know. So then about an hour after, she responded and said, "Could I give a temporary order, and then if I don't have everything finished or if I don't have everything back in line within a certain amount of time, you would then take rights to him?" And I said, "I'm sorry, you know, I would need full rights when I picked him up."

Q.    What did [Cathy] tell you?

A.    She then agreed. She said that was what was best for him and that she could not provide for him and that— I'm trying to think back. I'm so sorry. I'm nervous. She then said that the only thing she wanted is she wanted him to know about her.

Whatever Cathy might have understood from a text message about what "sign him over to me permanently" meant, and whatever the piece of paper she signed actually stated, the trial court's ultimate conclusion concerning the events of 17 November 2017[1] was *not* that they evidenced willful abandonment or neglect on Cathy's part. Instead, the trial court found that Cathy's decision was a reasonable childcare arrangement sought out under difficult circumstances.  The trial court explained:

I agree with the argument that the mother placing the child with the Petitioner, that was, in my view, an appropriate childcare arrangement that she reached out and made. I know [respondent-father "Greg"]—there's no evidence that he directly entered into that. *However, the*

---

[1] There is a discrepancy between the trial testimony about when this occurred and the trial court's finding of fact.  The finding of fact states this occurred on November 17, 2017.

-3-

*Court will rule that that ground has not been met for either.*
[emphasis added].

Karen testified that she and Cathy had telephone conversations and exchanged further Facebook messages over the next few weeks. Karen stated that at some time in "the latter part of 2018" she became aware that Cathy was incarcerated, and that Cathy would be incarcerated for all of 2019 up to the date of the hearing on 14 August 2019. Karen also admitted that she blocked Cathy from being able to message her on Facebook:

> Q.    Do you try to— is [Cathy] blocked from you?
>
> A.    I can still see her things. I actually have every one that we every (sic) sent on my phone.
>
> Q.    But you haven't blocked her from sending you messages on Facebook?
>
> A.    Yeah, I blocked her. I did. That was after I got the request for Moneygram and when I had— there was no other— but my number, she's not blocked from that. She can always reach out to me by phone.
>
> Q.    Cell phone?
>
> A.    Yes. She's not blocked from anything except for Facebook. And that was only because, when I make posts about him, I didn't want her to be able to see pictures of him or things that we do in our lives. But my phone is still available.

The termination petition was filed on 18 January 2019 and the summons was addressed to Cathy at the N.C. Correctional Institute for Women in Raleigh. Thus,

Karen needed to present clear and cogent evidence that Cathy "willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of the petition" during the six-month period between 18 July 2018 and 18 January 2019. Cathy was incarcerated during the "determinative period" preceding the termination proceeding. "A parent's incarceration may be relevant to the determination of whether parental rights should be terminated, but our precedents are quite clear— and remain in full force—that incarceration, standing alone, is neither a sword nor a shield in a termination of parental rights decision." *In re K.N.*, 373 N.C. 274, 282, 837 S.E.2d 861, 867 (2020) (cleaned up). Accordingly, the burden was on Karen to prove that, "upon an analysis of the relevant facts and circumstances," Cathy willfully abandoned Larry. *Id.* at 283, 837 S.E.2d at 867–68.

The evidence the trial court relies upon does not support such a finding. Karen's testimony, supplemented by no other evidence besides the pleadings, simply does not prove that Cathy willfully abandoned Larry. All the Court could know based on Karen's testimony is that Karen did not hear from Cathy during the determinative period and that, for some unspecified part of that time, Cathy was incarcerated. Karen's testimony does not prove whether or not Cathy took steps to maintain a connection with her child given the opportunities available to her during her incarceration.

In the circumstances of this case, absent any other indications of Cathy's intent to abandon her son, the mere lack of *actual* contact by an incarcerated parent whose

location was known to the petitioner is not the same thing as evidence that the parent

did not *attempt* to make contact, as this exchange illustrates:

> Q.     Have you yourself had tried to contact her at all?
>
> A.     No, sir.
>
> Q.     And are you aware that she's tried to contact, if not
>          you, other people in your family to get a hold of you?
>
> A.     No, sir.
>
> Q.     Okay.
>
> A.     And I did speak to her mom regularly, and I've never
>          been advised of that at all.

This testimony proves *either* that Cathy did not make any attempt to contact Karen

in order to maintain a connection with Larry, *or* that she attempted to contact Karen

but was unsuccessful in her efforts. The former would be evidence that could prove

willful abandonment but the latter, standing alone as it was in this case, could not.

The absence of evidence is not the same thing as clear, cogent, and convincing

evidence to prove a fact. *See In re Moore,* 306 N.C. 394, 403–04, 293 S.E.2d 127, 132

(1982) ("G.S. 7A-289.30(e) provides, *inter alia,* that in an adjudicatory hearing on a

petition to terminate parental rights the court shall find the facts and 'all findings of

fact shall be based on clear, cogent, and convincing evidence.' ") Here, based on

Karen's evidence, the trial court *could not know what Cathy did or did not do while*

*in custody during the determinative six-month period.* The testimony only established

that if Cathy did make the efforts the majority identifies as necessary for an

incarcerated parent to make to demonstrate a lack of willful abandonment, namely "showing interest in [the] child's welfare by whatever means available," those efforts were unsuccessful.

At the dispositional stage of the hearing, after the trial court had found grounds to terminate Cathy's parental rights, Cathy testified that she attempted to contact Karen whenever she had access to Wi-Fi. Cathy attempted to contact Karen by Facebook Messenger, but Karen informed Cathy that she was blocking Cathy on Facebook because she had obtained custody of Larry and, as Karen testified, she "didn't want her to be able to see pictures of him or things that we do in our lives," or as Cathy testified, "[Karen] didn't want no drama or nothing to be said." Cathy also testified that she attempted to contact Karen and Larry by text messaging. Cathy testified that she wrote her mother, aunt, and grandmother in an attempt to contact Larry, to find out how he was doing, and to obtain pictures of him. Cathy testified that she also sent birthday, Christmas, and Easter cards to Larry through her mother, cards that she believed had been given to Karen.

This evidence was not presented at the adjudication stage. It is true that even it if had been presented, the trial court was free to make its own determination that Cathy's testimony was not credible. The fundamental point is that without evidence of what Cathy did or did not do, especially while she was in custody, the trial court could not merely assume that Cathy willfully abandoned her son.

Karen's testimony did not "prove" what Cathy did or did not do. The burden to

prove willful abandonment requires evidence of the parent's intent. In this context, "abandonment imports any wil[l]ful or intentional conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child." *In re K.R.C.,* 374 N.C. 849, 860, 845 S.E.2d 56, 63 (N.C. 2020) (quoting *Pratt v. Bishop,* 257 N.C. 486, 501, 126 S.E.2d 597, 608 (1962)). The trial court's factual findings do not support the legal conclusion that Cathy willfully abandoned her son, only that she was unable to get in touch with her son's caregiver while she was incarcerated. Under N.C.G.S. § 7B-1111(a)(7), that is a crucial distinction.

The allocation of the burden to petitioners to affirmatively prove by clear, cogent, and convincing evidence that termination is warranted is no mere technicality. Until termination was ordered, respondent enjoyed a "constitutionally protected paramount right" to the "custody, care, and control" of her child. *Owenby v. Young*, 357 N.C. 142, 148, 579 S.E.2d 264, 268 (2003). Because there are "few forms of state action [that] are both so severe and so irreversible" as terminating parental rights, the United States Supreme Court has long held that petitioners must carry the "elevated burden of proof" that termination is warranted by clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). Cases like this one "involving the State's authority to sever permanently a parent-child bond demands the close consideration the Court has long required when a family association so undeniably important is at stake." *M.L.B. v. S.L.J.*, 519 U.S. 102, 116–17 (1996). The

judiciary must be "mindful of the gravity of the sanction imposed on" a mother when her parental rights are terminated and accord all due respect to the substantive and procedural protections the law affords to even imperfect parents. *Id.* Before undertaking action that is "irretrievably destructive of the most fundamental family relationship," *id.* at 121, the trial court must find facts proving *respondent's* alleged lack of efforts to maintain a connection with her child, not simply facts attesting to *the petitioner's* experience and perception of her interactions with respondent.

Likewise, the factual findings in this case are insufficient to support the conclusion that Larry was a neglected child. It is well established that "[a] finding of neglect sufficient to terminate parental rights must be based on evidence showing neglect at the time of the termination proceeding." *In re Young*, 346 N.C. 244, 248, 485 S.E.2d 612, 615 (1997) (citing *In re Ballard*, 311 N.C. 708, 716, 319 S.E.2d 227, 232 (1984)). Moreover, a juvenile cannot be adjudicated as neglected solely based upon previous Department of Social Services involvement relating to other children. *See In re J.A.M.*, 372 N.C. 1, 9, 822 S.E.2d 693, 698. (2019). To support a conclusion that a juvenile does not receive proper care, the findings of fact must show current circumstances that present a risk to the juvenile. Where the child is not presently in the parent's custody, the trial court must make findings of fact that the parent previously neglected the child in order to reach the conclusion that the child is a neglected juvenile under N.C.G.S. § 7B-1111(a)(1). *See In re D.L.W.*, 368 N.C. 835, 843, 788 S.E.2d 162, 167 (2016) (citing *In re Ballard*, 311 N.C. 708, 713–15, 319

S.E.2d 227, 231–32 (1984)).

In this case, as the trial court observed, Cathy recognized when she was unable to provide for Larry and sought an appropriate alternative childcare arrangement, placing Larry with Karen. Karen's testimony was that Larry was healthy; there was no evidence that he suffered malnutrition, adverse health conditions or other issues while he was in Cathy's care. The evidence in this case does not establish past neglect. A trial court should not imply that a parent has neglected her child simply because she recognizes the difficulties attendant in her own circumstances and seeks to ameliorate their harmful consequences. To find neglect in this case treats the mother who takes definitive action to further her child's interests in desperate circumstances no differently from the mother who does not or cannot. The respondent's protective actions do not support the inference that she neglected her child under N.C.G.S. § 7B-1111(a)(1).

The trial court's error with regard to the third ground, prior termination of the parent's rights as to other children under N.C.G.S. § 7B-1111(a)(9), is readily apparent from the trial transcript and the trial court's order. The statute provides that the court may terminate the parental rights upon a finding that "[t]he parental rights of the parent with respect to another child of the parent have been terminated involuntarily by a court of competent jurisdiction and the parent lacks the ability or willingness to establish a safe home." N.C.G.S. § 7B-1111(a)(9). Here, the court made the first requisite finding for this ground—that respondent's parental rights had been

terminated "with respect to another child"—but completely omitted any consideration of the second requisite finding that respondent lacked the ability or willingness to establish a safe home. It seems possible that counsel inadvertently misled the trial court on this point when stating at trial, "Well, I'll be brief. You know, it's kind of cliche. It is what it is as far as the respondents being involuntarily terminated before. It just is a fact, so that technically is a ground good enough to get us past adjudication." Further, the trial court's conclusion of law in its order terminating parental rights on this ground states only that "[t]he parental rights of both Respondents have been terminated involuntarily by a Court of competent jurisdiction [N.C.G.S. § 7B-1111(a)(9)]." Therefore, where the trial court was operating under a clear misunderstanding of the applicable law on this question and the evidence was insufficient to support other grounds for termination, the case should be remanded for further findings on the question of whether the evidence was sufficient to show that Cathy lacked the present ability or willingness to establish a safe home. It may be that the evidence produced at trial was clear, cogent, and convincing that Cathy does not have the will or the ability to provide a safe home for Larry. However, those are findings that, in these circumstances, should be made in the first instance by the trial court.

For the above stated reasons, I respectfully dissent.